**EXHIBIT "1"**

**EXHIBIT "1"**

CODE 4085

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
IN AND FOR THE COUNTY OF WASHOE

Andrea McNulty
_____,
Plaintiff(s),

vs.

Harveys Tahoe Management Company, Inc., et al.
_____
Defendant(s).

_____/

Case No. CV10 02059

Dept. No. 8

## SUMMONS

**TO THE DEFENDANT:  YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU
WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND IN WRITING WITHIN 20 DAYS.
READ THE INFORMATION BELOW VERY CAREFULLY.**

A civil complaint or petition has been filed by the plaintiff(s) against you for the relief as set forth in that
document (see complaint or petition).  When service is by publication, add a brief statement of the object of the
action.  See Nevada Rules of Civil Procedure, Rule 4(b).
The object of this action is: Tortious Discharge, Public Policy Tort, Intentional Infliction of Emotional Distress

1.  If you intend to defend this lawsuit, you must do the following within 20 days after service of
this summons, exclusive of the day of service:
   a.  File with the Clerk of the Court, whose address is shown below, a **formal written
   answer** to the complaint or petition, along with the appropriate filing fees, in
   accordance with the rules of the Court, and;
   b.  Serve a copy of your answer upon the attorney or plaintiff(s) whose name and address
   is shown below.

2.  Unless you respond, a default will be entered upon application of the plaintiff(s) and this Court may
enter a judgment against you for the relief demanded in the complaint or petition.

Dated this _____ day of _____ NOV 0 4 2010 _____, 20____.

Issued on behalf of Plaintiff(s):

Name: Calvin, R.X. Dunlap, Esq. & Monique Laxalt, Esq.
Address: 537 Ralston Street
Reno, Nevada 89503
Phone Number: 775 323-7790

HOWARD W. CONYERS
CLERK OF THE COURT

By: _____
Deputy Clerk
Second Judicial District Court
75 Court Street
Reno, Nevada 89501

1

### AFFIDAVIT OF PERSONAL SERVICE
(To be filled out and signed by the person who served the Defendant or Respondent)

STATE OF _____ )
                                        )
COUNTY OF _____ )

I, _____, being first duly sworn, depose and say:
     (Name of person who completed service)

1. That I am not a party to this action and I am over 18 years of age:

2. That I personally served a copy of the Summons, the Complaint for Divorce, and the

   following documents: _____

   _____

   _____

   upon _____, at the following
          (Name of Defendant or Respondent who was served)

   location: _____

   _____

   on the _____ day of _____, 20_____.
                                    (Month)              (Year)

   _____
   (Signature of person who completed service)

Subscribed and Sworn to before me this

_____ day of _____, 20_____.

_____
         NOTARY PUBLIC

**SECOND JUDICIAL DISTRICT COURT**
**COUNTY OF WASHOE, STATE OF NEVADA**

**AFFIRMATION**
**Pursuant to NRS 239B.030**

The undersigned does hereby affirm that the preceding document, _____

## SUMMONS

(Title of Document)

filed in case number:_____ CV10 02059

☑ Document does not contain the social security number of any person

**-OR-**

☐ Document contains the social security number of a person as required by:

☐ A specific state or federal law, to wit:

_____
(State specific state or federal law)

-or-

☐ For the administration of a public program

-or-

☐ For an application for a federal or state grant

-or-

☐ Confidential Family Court Information Sheet
(NRS 125.130, NRS 125.230 and NRS 125B.055)

Date:_____          _____
                                                      (Signature)

                                 _____
                                                      (Print Name)

                                 _____
                                                      (Attorney for)

Affirmation
Revised December 15, 2006

$1425

Calvin R. X. Dunlap, Esq.
Nevada State Bar #2111
Monique Laxalt, Esq.
Nevada State Bar #1969
P. O. Box 3689, Reno, Nevada 89505
537 Ralston St., Reno, Nevada 89503
775-323-7790
Attorneys for Plaintiff

FILED

2010 JUL -8 PM 3: 08

HOWARD W. CONYERS

BY   D. Jaramille

DEPUTY

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

Andrea McNulty,

                    Plaintiff,

vs.

HARVEYS TAHOE MANAGEMENT
COMPANY, INC., a Nevada Corporation;
HARRAH'S ENTERTAINMENT, INC., a
Delaware Corporation; HARRAH'S
OPERATING COMPANY, INC., a Delaware
Corporation; DOES I-XXX, and
ABC CORPORATIONS A-Z;

                    Defendants.

_____/

Case No.    CV10  02059
Dept. No.:       8

## COMPLAINT

COMES NOW, the Plaintiff in the above entitled matter, by and through her

undersigned attorneys, and alleges the facts and legal claims set forth below.

1

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

## JURISDICTION

## THE PARTIES AND THEIR AGENTS

1.     The parties have caused events to occur in Nevada from which these claims arise.

2.     Plaintiff, Andrea McNulty was, and at times relevant hereto, was and is a resident of the State of Nevada.

3.     Defendant Harveys Tahoe Management Company, Inc. is a Nevada corporation. At all times relevant hereto Harvey's Tahoe Management Company, Inc. was licensed to do business, and was doing business, in the State of Nevada, existing and doing business as a hotel and gaming establishment. Harvey's Lake Tahoe Management Company, Inc. owns, operates and manages Harvey's Lake Tahoe located at 18 Highway 50, Stateline, NV 89449. At all times relevant Harvey's Tahoe Management Company, Inc. was and is subject to laws of the State of Nevada.

4.     Defendant Harrah's Entertainment, Inc. is a foreign corporation, incorporated in the State of Delaware, licensed to do business, and doing business, in the State of Nevada, existing and doing business as a hotel and gaming establishment. Harrah's Entertainment, Inc. is the world's largest provider of branded casino entertainment through operating subsidiaries. Harrah's Entertainment, Inc. has business premises located on Highway 50, Stateline, Nevada and at all times relevant was and is a business subject to the laws of the State of Nevada

5.     Defendant Harrah's Operating Company, Inc. is a foreign corporation,

2

incorporated in the State of Deleware , licensed to do business, and doing business, in the
State of Nevada, existing and doing business as a hotel and gaming establishment. Harrah's
Operating Company, Inc. is the Operating Company of Harrah's Entertainment Inc. and as
such is the operating company of all material operating subsidiaries including but not
limited to Defendant Harrah's South Shore Corporation. Harrah's Operating Company, Inc.
has business premises located on Highway 50, Stateline, Nevada and at all times relevant
was and is a business subject to the laws of the State of Nevada.

6.    Plaintiff does not know the true names or capacities of the defendants sued
herein as DOES 1 through 20; therefore, Plaintiff sues said defendants by such fictitious
names, and prays leave that when the true names of said defendants are ascertained, they
may be inserted with appropriate allegations. Plaintiff is informed and believes and, upon
such information and belief, alleges that each of the defendants designated herein by such
fictitious names is responsible in some manner for the events and happenings hereinafter
referred to and that such conduct of defendants caused injury and damages proximately
thereby to Plaintiff. Upon learning the true and identities of DOES 1 through 20, Plaintiff
will seek leave of court to amend this Complaint.

7.    Plaintiff does not know the true names or capacities of the defendants sued
herein as ABC CORPORATIONS A-Z; therefore, Plaintiff sues said defendants by such
fictitious names, and prays leave that when the true names of said defendants are
ascertained, they may be inserted with appropriate allegations. Plaintiff is informed and
believes, and upon such information and belief, alleges that each of the defendants
designated herein by such fictitious names is responsible in some manner for the events and

3

happenings hereinafter referred to and that such conduct of defendants caused injury and damages proximately thereby to plaintiff. Upon learning the true names and identities of ABC CORPORATIONS A-Z, Plaintiff will seek leave of court to amend this Complaint.

8.   At all times relevant herein, Defendants, and each of them, were the agents and employees of each of the remaining defendants, and were at all times acting within the course and scope of said agency and employment, and each defendant has ratified and approved the acts of the other. Therefore, each defendant is liable for the acts of each remaining defendants.

9.   The corporate defendants, and each of them, were acting by and through their authorized employees, agents, and/or representatives, who were acting within the scope and course of said capacity, and whose conduct was ratified by each of said defendants.

10.   Plaintiff, Andrea McNulty was, and at times relevant hereto, a resident of the State of Nevada.

11.   The parties have caused events to occur in Nevada from which these claims arise.

12.   The acts of Defendants' agents were committed within the course and scope of their employment and therefore they are individually liable and their employer is vicariously liable under the Doctrine of Respondeat Superior.

13.   The Harrahs Defendants (hereinafter sometimes "Harrahs"), at all relevant time were and are gaming and hotel companies that employ John Koster, Guy Hyder, David Monroe, and other agents.

4

14.    John Koster (hereinafter sometimes "Koster") was, on information and belief, at all times relevant, President of Harrah's Lake Tahoe and was employed by Defendants.

15.    Guy Hyder (hereinafter sometimes Hyder) at some times relevant, was Chief of Security at Harrah's Lake Tahoe and is now believed to be employed in Reno, Nevada by Defendants.

16.    Dave Monroe (hereinafter sometimes Monroe) at some times relevant, was and is Vice President of Food and Hotel Operations at Harrah's Lake Tahoe.

17.    Debbie Neall (hereinafter sometimes Neall) at all times relevant hereto was an Employee Relations Manager for Harrah's Lake Tahoe.

18.    On information and belief Plaintiff alleges that Defendant Neall was and is a resident of Douglas County, Nevada.

19.    Mark Masters (hereinafter sometimes Masters) at all times relevant hereto, was and is employed at Harrah's Tahoe in security and is a close associate of Hyder.

20.    Stacy Dingman (hereinafter sometimes Dingman) was formerly and at some times relevant hereto was Director of Hotels at Harrah's and was and is currently employed by Lakeside Inn and Casino in Nevada.

21.    Bryan Cascuscelli (hereinafter sometimes Cascuscelli) was and is, at all times relevant hereto, Harrah's Tahoe's Director of Player Development.

5

537 RALSTON STREET
POST OFFICE BOX 3699
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

## FACTS

22.     In or about March of 2003, Plaintiff McNulty applied for a position in the Hotel at Harrah's Lake

Tahoe, was offered a job, accepted the offer, and relocated to Lake Tahoe, State of

Nevada.

23.     Plaintiff began her employment with Harrah's in about March of 2003 as a

Hotel Shift Manager, at the Front Desk.

24.     Plaintiff was promoted to the Reflection's Spa Manager in or about July,

2004.

25.     After approximately six months, Plaintiff became the VIP Shift Manager.

26.     Approximately six months later, she was promoted by the Vice President of

Hotel Operations to the VIP Services Manager.

27.     Plaintiff was responsible for setting the direction of VIP departments,

budgeting, and capital project submissions.

28.     Plaintiff was also appointed to serve on the project team that oversaw the

building of the Summit Suite Penthouses, a 30 million dollar project.

29.     Plaintiff was, also, charged with the responsibility of building, and training

the Butler staff.

30.     Plaintiff eventually was recognized by Harrah's as the "Leader of the

Quarter" for the Tahoe properties.

31.     After completion of the capital projects, with success and getting them off

the ground, Plaintiff sought to transition into the Casino Marketing department.

32.   Plaintiff applied for the position of an Executive Casino Host, was offered the position in February, 2008 and began reporting to the Vice President of Casino Marketing, Jennifer Trinkaus.

33.   In July of 2008 the NBC American Century Celebrity Golf Tournament was held at Lake Tahoe.

34.   In addition to her regular responsibilities, Plaintiff was scheduled by Harrah's, her employer, to be on the Penthouse floor each and every night during the event serving a concierge-like function in addition to her other duties.

35.   When Plaintiff questioned this, Plaintiff was told by her superiors that because of her level of expertise, reputation for excellent service, and knowledge of the Penthouse facilities and Staff she was selected to serve the important and celebrity guests, on that floor.

36.   Plaintiff felt honored to be considered for such a position and reported each day to carry out her other duties and those duties.

37.   Prior to the event starting, Plaintiff was introduced, by one of the Butlers, to Ben Roethlisberger, an NFL Quarterback for the Pittsburgh Steelers who had checked in on or about July 5, 2008.

38.   Plaintiff knew that Roethlisberger was a celebrity, but was not very familiar with his football career.

39.   Plaintiff was, also, familiar with Roethlisberger's name from hearing Harrah's President, John Koster, bring his name up on several occasions.

40.   Plaintiff also learned that John Koster was paired with Ben

7

1    Roethlisberger for the golf event.

2

3      41.     Plaintiff learned that Koster boasted about what good friends he and

4 Roethlisberger were on many occasions.

5      42.     There were other very high profile guests on the floor, including, among

6 others, Michael Jordan and Charles Barkley.

7      43.     On or about July 2008, Roethlisberger came to Plaintiff's desk and struck up

8 a conversation. There was a discussion of fly-fishing and of the fact that Plaintiff was an

9 avid fly fisherman.

10

11      44.     It was Plaintiff's responsibility to serve all of these guests on the floor, in

12 addition to her role as an Executive Casino Host.

13      45.     Hyder, the Harrah's Director of Security, commented to Plaintiff on how

14 pleasant Roethlisberger was, and said that Koster was a huge fan of Roethlisberger.

15      46.     Hyder emphasized how important it was for Plaintiff to ensure that

16 Roethlisberger had a nice trip.

17

18      47.     On the evening of Friday, July 11, 2008, Plaintiff, after being on the casino

19 floor in the high limit area, taking care of one of her guests, returned to her post on the

20 Penthouse floor , at approximately 10 PM. The same day she was advised by Hyder that

21 Alvaro Brito was being terminated because of a complaint by Roethlisberger.

22

23      48.     On Friday, July 11th, 2008, Plaintiff was at her post, on the seventeenth

24 floor, in the Penthouse area, at approximately ten o' clock p.m. in the evening.

25      49.     Ben Roethlisberger returned to his room with a young woman who Plaintiff

26 had not seen before. She left his room approximately 20 minutes later.

27

28

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7789 • FAX (775) 323-5454

8

50.   Roethlisberger walked the young woman to the elevator. He then stopped by Plaintiff's desk and said hello. He talked with other staff for approximately 20 minutes.

51.   As Roethlisberger left, he mentioned to Plaintiff that his television sound system was not working.

52.   Plaintiff offered to have someone from engineering fix it.

53.   Roethlisberger said that he would call about it later.

54.   A few minutes later, Ben Roethlisberger's name came up on Plaintiff's telephone, at her desk.

55.   Plaintiff answered the phone, and Roethlisberger said that his television was still broken and asked if Plaintiff could fix it.

56.   Plaintiff said that she would have someone look at it and he responded by asking if Plaintiff would come and "take a quick look".

57.   Plaintiff called her boss, Jennifer Trinkaus, the VP of Casino Marketing, but Trinkaus did not answer her phone. Plaintiff later learned that Trinkaus was allegedly in the nightclub.

58.   Plaintiff also called engineering, but was unable to reach anyone.

59.   Roethlisberger called, again, asking when Plaintiff was going to fix the television.

60.   Mindful of Hyder's earlier admonition that Koster wanted to be sure that Roethlisberger had a good trip, and because of Roethlisberger's insistence, Plaintiff decided to check the TV herself for him.

61.   Plaintiff knocked on Roethlisberger's door, the last door on the left at the

9

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

end of the hallway on the 17th floor and Roethlisberger opened it. He was wearing athletic

shorts and a t-shirt.

62.    Plaintiff entered the room.  The room was a mess.

63.    Plaintiff asked  which television it was that was malfunctioning.

64.    Roethlisberger led her to the adjacent room and pointed at the bedroom

television.

65.    Plaintiff picked up the remote controls and attempted to identify and solve

the alleged problem or problems.

66.    The equipment functioned properly and Plaintiff could see no problem with

the television or with the sound system and so informed Roethlisberger.

67.    As Plaintiff attempted to leave the room, Roethlisberger stood in front of

Plaintiff, blocking her way.

68.    Roethlisberger was and is a very large person, reportedly Six Foot Five

inches tall and approximately two hundred and fifty pounds, much larger than Ms.

McNulty.

69.    Roethlisberger grabbed Plaintiff and started to kiss her.

70.    Plaintiff was shocked and stunned that this previously friendly man, that

appeared to be a gentleman in her previous contacts with him, was suddenly preventing her

from leaving, was assaulting her and battering her.

71.    Plaintiff communicated her objection and lack of consent.

72.    Ms. McNulty feared that since he was a football player he could or

would physically harm her if she attempted to fight him.

10

73.   Plaintiff protested several times, but instead of stopping, Roethlisberger began fondling Plaintiff through her dress and between her legs.

74.   Roethlisberger held her against her will and physically moved Plaintiff and pushed her onto his bed.

75.   Despite additional protests, he kept going, pulled her underpants off and proceeded to penetrate her.

76.   Plaintiff continued to protest "You don't want to do this."

77.   Panicked, Plaintiff begged, "Please don't do this" and, also, hoping it would cause him to stop, attempted to stop him by saying, " I am not on any type of birth control."

78.   Roethlisberger continued to penetrate Plaintiff, against her will, stating, "Don't worry. I will pull out."

79.   Roethlisberger did "pull out" and ejaculated on Plaintiff's stomach.

80.   After that, Roethlisberger allowed Plaintiff to get off of the bed.

81.   Very shocked and upset, Plaintiff got up and immediately went into the bathroom, where she splashed water on her face, and tried to pull herself together.

82.   When Plaintiff came out of the bathroom, Roethlisberger asked, "There are cameras on this room, aren't there?" Plaintiff said, "Yes. There are cameras everywhere."

83.   Roethlisberger, acting very worried, sternly instructed her, "If anyone asks you, you fixed my television." "You fixed my television." "Now go!" he said sternly.

84.   Plaintiff, terrified left the room, embarrassed, stunned and confused.

Plaintiff left the building, shortly thereafter, and went to her truck, in the parking

557 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

11

1   lot, and drove away, very distraught, and crying.

2

3       85.   The next day, Plaintiff reported to work and attempted to do her job, but still

4   very shocked and distressed, sobbing and crying hysterically, Plaintiff called Guy Hyder,

5   the Director of Security, and told him what happened.

6       86.    Hyder dismissed Plaintiff's distress and hysteria and responded by saying

7   that Plaintiff was "over reacting" and that "most girls would feel lucky to get to have sex

8   with someone like Ben Roethlisberger." Hyder further stated to Plaintiff that "Koster would

9
    suck his [Roethlisberger's] _____."
10

11      87.    Plaintiff was shocked, emotionally upset,  and confused at the attitude of

12  Hyder and realized that Hyder, Harrahs' Chief of Security, would not assist her, would not

13  do anything adverse to Roethlisberger, and became concerned that she would be made the

14  villain rather than Roethlisberger and that her job would be jeopardized.

15
        88.    From the day of the assault, Plaintiff became increasingly anxious, afraid,
16
    and depressed.
17

18      89.    Plaintiff lost sleep, became very wary of others, and did not know who to

19  turn to after she had reported this very traumatic incident to Hyder, Director of Security,

20  assuming that the assault would be investigated by him, and that the appropriate

21  executives would be notified .

22

23      90.    Hyder, apparently unwilling to displease Koster or make the least inquiry,

24  particularly of Defendant Roethlisberger, did not do his job of investigating the assault

25  and, on information and belief, of properly reporting it as was his duty.

26
        91.     Plaintiff now suspects, however, that Koster was informed of the assault and
27

28                                            12

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

battery by Hyder, of her report of it and of his, Hyder's, cruel dismissal of the incident intended to discourage any report by Plaintiff.

92. Hyder failed to interview any witnesses, failed to preserve evidence and failed to follow company policy by no investigating the matter, particularly Roethlisberger, and, apparently fearful of reprisals by Koster or at his direction, failed to investigate and follow up on this sexual assault.

93. Plaintiff was told by Monroe that President Koster was very good friends with Roethlisberger and that she ever led on that she knew him, Roethlisberger, or had any personal conversations with him, Koster, "would personally fire you for starting rumors about his personal life."

94. "John will fire you, Andrea. That's how he is."

95. Plaintiff fell into a depression which deepened over time.

96. Plaintiff felt that she had nobody to turn to at Harrah's and was afraid of the consequences of reporting it to police authorities since it was obvious to her that Harrah's and its personnel, particularly Hyder and Koster, would side with and support Roethlisberger, the celebrity friend of Koster.

97. Plaintiff told herself that she just had to try to deal with the trauma on her own and get through Labor Day so she could go home and seek refuge with her family. Immediately following Labor Day, Plaintiff fell apart, stopped eating, could not sleep, suffered a nervous breakdown, and became so anxious and depressed that her self-care went dramatically downhill.

98. Plaintiff flew back to Lake Tahoe in bad shape, and was checked into the

13

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

Reno Renown Hospital on or about September 25th where she was diagnosed with major depression and anxiety.

99.    Plaintiff had to be fed intravenously because of the lack of fluids. The emergency room doctors felt that Plaintiff was very anxious and so depressed that she should be admitted to West Hills Hospital, a Reno facility that treated anxiety and depression. She was admitted on or about September 26th, 2008.

100.    While at West Hills, Plaintiff was heavily drugged, and was frightened and traumatized by the inmates, Plaintiff was hospitalized there until on or about October 2nd 2008.

101.    Upon discharge from West Hills, Plaintiff was put on several anti - depressants, anti-anxiety drugs and on sleep medication.

102.    Plaintiff filed for a Family Medical Leave Act (FMLA) leave and was released from work.

103.    Plaintiff did not recover and, therefore, was, then, sent to a care facility in Napa Valley.

104.    Plaintiff was admitted to St. Helena Hospital, on or about October 14th, 2008 and was released on or about October 30th 2008.  Plaintiff was diagnosed with extreme Post Traumatic Stress Disorder, Anxiety, and Major Depression.

105.    After leaving St. Helena Hospital, Plaintiff returned to her home at Lake Tahoe.

106.    Upon discharge treatment program for anxiety and depression on an outpatient basis .

14

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

107.   A few weeks later, on or about November 19th, 2008, Plaintiff was admitted to a Carson City Hospital, again, for major depression and anxiety and was in grave health due to not eating and sleeping.

108.   During the fall of 2008, while Plaintiff was hospitalized, Hyder entered into contact with Plaintiff's parents, stating falsely that the sole reason for Plaintiff's breakdown was the cessation of Plaintiff's e-mail correspondence with a young man, and omitting all reference to the sexual assault that had taken place on July 11, 2008.

109.   Hyder proceeded to gain the confidence of the McNulty family and pretended to be there as a friend for Plaintiff when, in fact, he was engaged in surveillance of her and her progress for his own purposes and/or for those of Koster and the Harrah's Defendants.

110.   Hyder, pretending to be a friend, persuading Plaintiff, that he should have a key to her home.

111.   Believing his stated purpose or purposes for having the key, Plaintiff provided him with a key. Subsequently, Hyder and one or more other agents of Defendants entered her home, and, on information belief, proceeded to examine and remove and alter the content of and the file or files and information on her laptop computer, invading her privacy, which was done without her knowledge and understanding, and was done for the purpose of providing the information to Harrah's and for their own purposes.

112.   Near the end of her leave time, Plaintiff, at risk of losing her job, and, particularly, concerned about the possible loss of her medical benefits and the assistance she so badly needed, returned to work during the Thanksgiving weekend, 2008.

15

113.   Plaintiff was thirty pounds lighter and her spirit was broken.

114.   Plaintiff attempted to work as hard as she could, but the setting was a terrifying reminder of the sexual assault and battery.

115.   Plaintiff was called by a "pit boss" at Harvey's, and went there to assist with a guest.

116.   The pit boss, during that visit to the pit, asked Plaintiff, "What happened? Why were you in the hospital?"

117.   Plaintiff became tearful and excused herself from the pit indicating to the pit boss that she couldn't talk about it.

118.   The next day, Plaintiff's Manager, Rod Campbell, called her at home and asked her to come to his office. She went to work early and was faced with Debbie Neall, the Manager of Employee Relations.

119.   Plaintiff received her first ever written documentation, for allegedly "losing control of her emotions in the workplace and making the employees uncomfortable." It was a "negative work history" and the first ever negative documentation Plaintiff had received from Harrah's.

120.   At the meeting, Defendant Neall did not ask for her version of what happened, nor did they ask any questions.

121.   Plaintiff, under the circumstances, refused to sign the write up.

122.   Because Plaintiff became very upset concerning this treatment, Debbie Neall took Plaintiff to the in-house clinic. The doctor said that Plaintiff was not well enough to work. He opined that she had been through a lot.

16

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

123. Plaintiff was put on another leave until March 3rd, 2008.

124. A few weeks later, Plaintiff was admitted to Barton Memorial Hospital at Lake Tahoe. Plaintiff was devastated and was very afraid of being retaliated against if she spoke out about what had happened.

125. Defendants have admitted, through their Counsel, that in late December 2008 or early January 2009, Koster, Monroe and Human Resources Director Mike Rosenow were informed by Hyder of Plaintiff's claim of sexual assault by Ben Roethlisberger and yet, upon meeting, made the decision to conduct no investigation.

126. After returning to work on Friday, March 6, 2009, Plaintiff was shown the negative work history from Harrah's based on the incident which had occurred in November of 2008, and was told that any further episodes would result in termination.

127. Plaintiff spoke with the physician at Harrah's, told him what had occurred, explained that she was always very afraid to say anything, and that was why she had suffered so much over the past few months.

128. The doctor said he would call Debbie Neall, the Manager of Employee Relations, concerning the matter. He reportedly cryptically inquired of Neall as to what Neall would do if an employee was assaulted or attacked by a guest while at work.

129. Neall reportedly responded that Harrah's would have no responsibility in reporting it but would encourage the employee to make a report with Douglas County Sheriffs Department.

130. The doctor asked Plaintiff for permission to discuss the incident with

17

Debbie Neall which Plaintiff gave to him, but, upon later inquiry by Plaintiff, the doctor said he had changed his mind about contacting employee relations and Debbie Neall, and suggested that Plaintiff would be better off not pursuing the matter further with Harrah's.

131. The Dr. released Plaintiff back to work on March 3rd, 2009. That return date was delayed by Neall.

132. Because of the lapse in the FMLA and the new start date, Plaintiff's health insurance was canceled.

133. Plaintiff went to Guy Hyder's office and asked to speak to him, privately.

134. Plaintiff was tearful and said, do you remember that day that I called you about the incident with Ben Roethlisberger, referring to the day after the sexual assault? Hyder said, Yes.

135. Plaintiff then said, I want you to know that that is specifically why I have fallen apart over the last few months. I was very scared and I didn't know what to do.

136. Plaintiff stated that her problems arose directly out of the sexual assault by Roethlisberger. Hyder said, "I figured that was what was wrong, but I thought it was just like a date rape thing." Hyder then said that he knew that Plaintiff was very distraught and upset, but that he thought that she had regretted sleeping with him and became upset.

137. Plaintiff, again, very upset by Hyder's comments, and disappointed with this statement, left Hyder's office in tears.

138. Plaintiff was told about an incident wherein the Director of Player Development, Bryan Casuscelli, Ben Roethlisberger's Executive Casino Host, was seen removing and throwing away Plaintiff's business cards that were in the Butler pantry.

18

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

139.  When confronted by one of the butlers, Casuscelli reportedly stated that she (Plaintiff) may be coming back (to work), but she would never be a Host again.

140.  Plaintiff complained to Supervisor Rod Campbell, but Campbell stated that he wasn't comfortable speaking to Casuscelli about it because he was hoping to be considered for the promotion to Vice President of Casino Marketing and speaking to Casuscelli might rock the boat.

141.  A few days afterward, Plaintiff had a meeting with Mike Rosenow, Vice President of Human Resources for Harrah's, and told him that she was very concerned with the write up, with Bryan Cascuscelli's remarks regarding the business cards, and the overall level of support, or lack thereof that she was receiving from Harrah's.

142.  She explained that she had been through a considerable amount of anguish and that she was trying her very best to return to work and be an asset to the company.

143.  Rosenow noted that John Koster was aware of the Defendant Bryan Casuscelli's actions and agreed that it was in very poor taste and would not be tolerated. Mike Rosenow assured Plaintiff that there would be written statements taken from the Butlers who were present.

144.  Rosenow asked Plaintiff to continue staying focused on her work.

145.  On or about the early part of March, 2009, Plaintiff, during the course of her work shift, was in the company of guests, and introduced the guest to Koster, Regional President.

146.  Notwithstanding Koster's awareness of Plaintiff's claim that she had been sexually assaulted by Ben Roethlisberger, Koster proceeded to engage in a laudatory

19

description of his "close friendship" with Ben Roethlisberger.

147.    Koster knew of the devastating impact this would have on Plaintiff, but chose, nonetheless, to send a message to Plaintiff and to intimidate her.

148.    On April 2, 2009, counsel retained by Plaintiff sent a letter to Gary Loveman, Chairman, Chief Executive Officer and Pres. of Harrah's Entertainment, Tom Jenkins, President, Western Division and William Buffalo, Vice President and Deputy General Counsel, informing them of the assault that had taken place on July 11, 2008, and of the acts of ratification, condonation and approval by the executives at Harrah's Tahoe, and of the acts and failure to act of Hyder, requesting a full and independent investigation of the entire matter and of those acts.

149.    On April 13, 2009, Loveman, Jenkins and Buffalo responded through their attorney, by a letter which not only ratified, approved and condoned the acts of Harrah's executives, but which sought to retaliate against Plaintiff through character assassination.

150.    The attorney, among other things, set forth false and scurrilous claims by Defendant Stacy Dingman who had combined with Hyder and others in this defamation and attacks on Plaintiff.

151.    Dingman has been known to be a close personal friend of and to be personally involved with Hyder.

152.    The Defendants sought by the letter and the accusations in it to intimidate and dissuade Plaintiff and her counsel from pursuing this matter against any of the Defendants. Plaintiff believes that no full and independent investigation was conducted by Harrah's Corporate.

20

153. Plaintiff requested access to the electronic surveillance and other phone and radio and electronic communications for the purpose of confirming facts relating to these claims. That access has been denied.

154. Nonetheless, demand has been made that all evidence in this matter be preserved, including, but not limited to all information regarding Ben Roethlisberger during his stay at Harrah's.

155. Subsequent to receipt of Plaintiff's Counsel's letters in April of 2009, the Harrah's entities, acting through their agents, have engaged in retaliation against Plaintiff for asserting her right to an investigation of the sexual assault and for bringing to light the Harrah's cover up of that assault. That retaliation ultimately led to her constructive discharge from her employment in November of 2009.

156. In April or May of 2009 Plaintiff spoke to Dave Monroe about a concern that she had for her personal safety and he said that she could park on a floor the parking garage. Plaintiff let her boss Rod Campbell know and then the next day she got called into a meeting.

157. Plaintiff went to the office at 3:00 pm and was asked to sit down at a table with chairs. Xenia and Rod Campbell were present. Xenia shut the door.

158. Xenia said, "Rod called me on Saturday and was concerned that you approached him that afternoon and asked if you could park on the ground floor of the garage because you are scared. When I hear something like this it concerns me because first and foremost this sounds concerning, and secondly, what I do for one employee I need to

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

21

consider doing it for another to be fair and consistent. Do you want to tell me why you are scared?"

159. Plaintiff said politely, making direct eye contact with both of them, "I appreciate that, however, I am not sure if you are aware but I have retained legal counsel and I am under strict orders not to have conversations regarding my safety with anyone."

160. Xenia continued to press questions asking why Plaintiff was afraid and was it someone on her shift. Plaintiff said to them directly, again, "I am not able to discuss any details regarding the incident that occurred last summer during the Celebrity Golf."

161. Rod Campbell then asked Plaintiff if the onset of the event and booking the event was causing her any anxiety or fear. Plaintiff said, "I can't discuss this with you". Xenia then tried to press again and asked, "You are scared because something happened to you? Is it someone here on property?" Plaintiff said nothing. Xenia said, "No?" Plaintiff explained to her again that she could not discuss it.

162. Xenia then said, "I did hear that something happened a while ago but it was before I took over the department so it never had anything to do with me. I was not involved in those conversations. When an employee is in the midst of pending litigation with our company, everything is kept very confidential. However, if you are asking for special parking, I have to go to HR and report it especially if you have a concern for your safety".

163. Plaintiff said, "I was not asking for permission. Dave Monroe and I were talking the other day and I explained to him that I had a concern about my personal safety at work walking to my truck at night and asked if I could park my truck on the A floor. He

22

said it was fine so long as I gave Anna, the Director of Hotel, and Rod a heads up so they would not think that I thought I was entitled to park there. As a courtesy, I let Rod know that I spoke to Dave and Anna about it and it was okay with her". Xenia then said, "Dave approved that?! He can't do that!" Plaintiff said, "The Harrah's attorneys can direct any questions to my attorneys if necessary. I can't discuss it with you .. Please understand that."

164.    Notwithstanding the Defendants' full awareness of the assault which took place on July 11, 2008, they, again, invited Defendant Roethlisberger to be the guest of Harrah's during the 2009 Celebrity Golf Tournament, while insisting that Plaintiff, to the detriment of her client relations, and her professional future, take a paid leave for a two-week period of time to accommodate her assailant. Defendants did so with full knowledge of the emotional impact such action would have on Plaintiff.

165.    On Friday, July 3rd, 2009, Plaintiff was contacted on her cell phone by Xenia Wunderlich, Vice President of Casino Operations, and asked to come down to Debbie Neall's office for a moment in Human Resources. She went down and was met by Xenia and a man that she had never seen before. Xenia introduced Matt Krystofniak and he shook Plaintiff's hand and led Plaintiff into Debbie Neal's office. Debbie Neal was not in her office. Krystofniak shut the door and Plaintiff was offered a seat. Xenia said that Plaintiff looked nice and she said, "Pretty dress." Plaintiff sat down. Krystofniak asked Plaintiff, "Before we get started, do you have any recording devices on you?" Plaintiff said, "No I do not." He said, "That is a standard question." Plaintiff asked, "Do you have any recording devices turned on?" He stuttered and said, "No I don't. I don't own any." He introduced himself as the Reno Director of Human Resources and said that he was filling in on an.

23

interim basis. He was holding a piece of paper.

166.    Krystofniak said that he and Xenia wanted to bring Plaintiff in to discuss Celebrity Golf. He said that it was coming up and that it was their understanding that it was a sensitive time because of an incident that occurred last year.

167.    Krystofniak said that he was presenting Plaintiff with a letter to read. He said that Xenia had not read the letter nor did she know what it was about. He said that he had to tell Xenia some details but that she didn't read the letter. Xenia said that she had not seen the letter.

168.    Plaintiff read the letter and became tearful. Xenia said, "Oh my gosh, she's shaking. Get her some Kleenex. My gosh you are shaking." She handed me a Kleenex. As Plaintiff was reading the letter Matt said, "Obviously based on your reaction of the letter this is upsetting to you." Plaintiff asked him if she could finish reading the letter. He apologized for interrupting. He appeared was very nervous. When Plaintiff was finished reading the letter she sat quietly tearful and wiped the tears from her eyes with a Kleenex

169.    Krystofniak said, "Obviously this is upsetting to you. We are concerned about your safety and your well being and we want to give you the opportunity to take a fully paid leave of absence during the Celebrity Golf Event to keep you from being in an emotionally upsetting situation. We don't want you to face someone that makes you feel unsafe. Xenia said, "Yes, we care about your safety."

170.    Krystofniak said that the leave would begin on July 7th and Plaintiff would return after the event. Xenia said that Plaintiff could take a few extra days off if necessary. Matt said that it would not impact Plaintiff's bonus or any coded guests that were attending

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

24

the event. Xenia said that June Arjellano would oversee Plaintiff's guests in her absence because he did not have a lot to do.

171.    Krystofniak said that "I just love employees. I am a really sensitive guy. I care about employees." He said, "Xenia hasn't read the letter but if you would like to discuss the incident that occurred with me I will have my cell phone on me 24 hours each day. My wife will not be happy about it, but I will keep the phone on my night stand."

172.    Plaintiff informed Krystofniak that she could not discuss the incident. "My attorneys are available if you would like to speak to them." Krystofniak said that he was not permitted to speak to Plaintiff's attorney and that he could only speak to Plaintiff directly.

173.    Krystofniak said he understood that but said that he was available to discuss it. He also said that if he, or if Xenia discussed this with anyone that they could face termination. He asked Plaintiff to "keep the meeting among the three of us." He said repeatedly that "This meeting does not go outside this room."

174.    He asked Plaintiff if she had any questions. Plaintiff asked, "Does anyone else know that you are having this meeting with me?" He looked very nervous and said, "I don't know."

175.    · Plaintiff asked, "Who wrote this letter?" Krystofniak said, "I did." Plaintiff asked, "Does John Koster know that you wrote this letter?" He said, "I don't know if John Koster knows or not." Xenia said she did not read the letter. Plaintiff asked ,again, "So who wrote this letter?" Krystofniak said, "Harrah's General Counsel wrote it." Plaintiff said, "Thank you. May I have your card?" .

25 .

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

176. Krystofniak was so nervous he did not know what his own phone number was when he tried to write it on the card. He asked Xenia what his phone number was. He looked extremely nervous and stressed out.

177. Further, Dave Monroe attempted to dissuade Plaintiff from pursuing her claims by urging Plaintiff to not trust attorneys in general and her attorneys in particular while pretending to be her friend.

178. Plaintiff filed suit on July 17, 2009 in the Second Judicial District Court for the State of Nevada against Roethlisberger and Koster, Hyder, Monroe, Casuscelli, Neall and Dingman. Thereafter, Defendants' efforts to intimidate, silence and retaliate against Plaintiff intensified.

179. Plaintiff's department was ordered to move into the old Finance space in a cubicle setting, facilitating the observation of and monitoring of the activities of Plaintiff. This decision was reportedly made by Xenia Wunderlich, Vice President of Casino Operations, claiming that it would improve the morale of the department.

180. Plaintiff's desk was placed the closest to the manager, Jesse Hughes', desk and there was rumored to be a camera above the pod of cubicles. Nearly everyone could overhear Plaintiff on the telephone, making it very awkward for her to acknowledge any guests or employees that were showing support for Plaintiff over the phone. It also prevented employees from stopping by her office to have private conversations.

181. One employee opposed this setting because he couldn't concentrate on his work in that setting so he moved to make his calls from an office elsewhere. He was reprimanded for not doing his work in this office.

26

182. In September, October and November of 2009, Harrah's booked 3 Junket flights from Pittsburgh, the hometown of Plaintiff's assailant Ben Roethlisberger. The guests were very vocal on the casino floor, yelling "Go Big Ben!" when Plaintiff walked across the casino floor. Dealers told Plaintiff that they were constantly being asked by these guests where Plaintiff was and what she looked like. They said things like, "I want to stay in the suite that she said he did this to her in." "I want to see the room where it happened." Some said things like, "We came all the way out here to hunt her down."

183. Harrahs allowed such to occur knowing the impact it would have on Plaintiff.

184. Further, Plaintiff received an abusive call from a guest demanding that Plaintiff go to his room and bring "three hookers". When Plaintiff reported this to her boss Jesse Hughes, Director of Casino Marketing, Defendants did nothing to admonish the guest, knowing the impact it would have on Plaintiff.

185. Further, Defendants took action to suppress any statements by employees of of support for Plaintiff. A dealer in the high limit room at Harrah's told Plaintiff that a guest asked her about Plaintiff and the dealer had said, "She is such a good person." Later, the dealer she told Plaintiff that she had been pulled aside by her manager and told that she was not to ever say that Plaintiff was a nice person. The dealer was instructed that regardless of the context of a conversation, she was not to ever say anything but "I have no comment." The dealer tried to explain that she was Plaintiff's friend, but the Pit Boss did not want to hear it.

186. After Plaintiff reported the incident to Xenia Wunderlich, and after Plaintiff

27

was assured that that should not happen, the dealer later got back to Plaintiff and told her that Xenia went to her and instructed her to continue saying, "No comment," even though Xenia told Plaintiff that that was wrong.

187.   After Plaintiff's co-employee and former roommate Wyle Cordes gave an Affidavit in support of Plaintiff's allegations, he was called in to Koster's office and interrogated at length.

188.   Plaintiff was harassed in a variety of ways. For example, she got pulled into the office of VP of HR Matt Krystofiak and Xenia Wunderlich right next to John Koster's office and was reprimanded for sending an email to assist an important customer. Xenia told Plaintiff how disappointed she was in Plaintiff for sending it and not going to her for help. They went on and on about how they were there to support Plaintiff and how Plaintiff chose not to ask them for their help. Krystofiak went on to blame Plaintiff for not using his cell phone number that he offered up. Xenia went on about what a great company Harrah's was. They were taking copious notes, writing down everything that Plaintiff said. Plaintiff said that Harrah's had demonstrated no concern for her or her well being, whatsoever.

189.   Harrah's sent out a company wide email asking that Plaintiff's records be preserved. The memo's were posted everywhere. They did not ask that John Koster's, Guy Hyder's, Debbie Neall's, Bryan Casuscelli's, or Stacy Dingman's records be preserved.

190.   At one point, a claim was made by Defendants that a large volume of company records had disappeared from the computer system. Plaintiff does not know if these included records of Koster, Hyder, Neall, Casuscelli or Dingman.

191.   Employees were informed that they were subject to termination if they

28.

spoke to anyone about the Roethlisberger incident.

192.   Security employees were instructed to write down the names of the people that talked to Plaintiff or offered her support at work. They were to report the names of the employees, what department they work in, and where the conversation took place.

193.   Plaintiff was told by several employees that she am being watched very carefully.

194.   Jesse Hughes (Casino Marketing Manager) brought Plaintiff into his office and said, 'Mary, I need you to be a witness." Mary Kunce is a Supervisor and she did not have any say over Plaintiff, and if anything, Plaintiff's position was far superior to hers, so Plaintiff had no idea why she was sitting in on the conversation. Hughes asked Plaintiff if she was late for work. Plaintiff said that she was not and that she was in fact early for work. He said that he had heard from someone that Plaintiff was late. When Plaintiff asked him who had said she was late, he said he didn't know.

195.   John Koster had a door put on the executives offices that required persons to be buzzed in. This was the first time that a set up had been made like this.

196.   Plaintiff was required, along with other employees, to sign an employment contract with termination being the penalty for failure to sign.

197.   John Koster shunned Plaintiff every time she saw him. Koster glared at Plaintiff. Koster shunned Plaintiff at an employee staff meeting, saying hello to everyone but her. He shunned her on the casino floor while walking with Dave Monroe. He shunned her in the cafeteria while sitting with Dave Monroe and the CFO Jonathan Halkyard.

198.   When Casino Host Angie Antonetti left the company Plaintiff received her

29

list of players, however they took out the top 100 and gave them to other people (mostly Bryan Casuscelli). Whenever someone else had left the department, their list was given to another host in its entirety. Plaintiff was left with a poor list of players.

199.    Fear was instilled in employees. When Plaintiff talked to employees, they would say things like, "I need to go. I'm scared that I am going to get fired from talking to you."

200.    On July 21st, 2009, Harrah's issued a Media Policy that stated: "Harrah's Corporate Communications Department is responsible for the preparation and release of any information, statement, or news stories concerning the Company, employees, guests or its subsidiaries or brands. Local press releases may be prepared and distributed by the designated property public relations representative only. No employee shall answer any questions, express any opinions, confirm or deny any fact, supply any documentation (including photos) or make any statement concerning the Company, employees, or guests to any news media representative. All calls, questions or inquiries from members of the press or media must be referred to the Communications Department, specifically John Packer who can be reached through the Hotel Operator. No employee may supply the press or media with any information related to the Company, its employees, or guests without the expressed authorization of the Communications Department. This includes, but is not limited to, posting company information on Social Network / Social Media sites (eg. Text Messages, Twitter, Facebook and/or MySpace, etc) and sending e-mails via Outlook and/or Blackberry or similar devices to any media or outside sources. The only acceptable response to media inquiries should be, 'I have no comment. However, you can contact our

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

30

Communications Department, specifically John Packer at 775-586-6541.' Any violations to this policy or other company policies may result in disciplinary action, up to and including separation of employment."

201.    An excessive volume of Steelers games were on at the televisions throughout the casino. For example, on Sunday the 4th of October, 2009 Plaintiff's schedule was changed to 11- 8. Usually Plaintiff was off at 7:00 p.m.. Plaintiff had to go to the high limit pit to print a comp slip for a guest. When Plaintiff walked on to the casino floor she noticed that every tv was tuned into a Steelers game. As Plaintiff was fumbling to print the slip the game was playing, Ben Roethlisberger was on screen and people were shouting at the game. The employees were staring at Plaintiff as if to get a reaction and Plaintiff was fumbling and making several errors to print the comp because she was so nervous and upset that he was right there. Plaintiff believes she made 5 errors in printing the comp slip incorrectly because of the distraction and she was fighting back tears. The game was on every tv she could see, on all tvs in the bar, on a huge movie screen at the center of the casino, on every panel in the high limit areas, in the hotel lobby and when she left work it was on in the valet. Plaintiff believes that they were instructed to put the game on.

202.    Further, when ESPN "Outside the Lines" ran a special on Plaintiff, Defendants tuned the Casino's televisions into that program, broadcasting throughout the Casino intimate facts about Plaintiff as well as a barrage of negative comments made against Plaintiff.

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454.

31

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7700 • FAX (775) 323-5454

203. In October of 2009, Harrah's took action against Plaintiff in an attempt to falsely put her in line for impending termination, based on a false allegation that Plaintiff had made a comment which had offended her co-worker Rick Lemley. This conduct on the part of Harrah's, like the hostile treatment to which Plaintiff had been subjected during the prior months, was intended by Harrah's to force Plaintiff to leave her employment.

204. On Tuesday, October 26th, 2009 Plaintiff was called to a meeting in the Executive Offices at approximately 3:00 p.m.. Xenia Wunderlich had called the meeting the day before. Plaintiff went to the meeting and was brought into Matt Krystofiak's office, the VP of Human Resources and he called Xenia Wunderlich in from her office. Plaintiff sat down at the table in front of his desk.

205. Krystofiak called Xenia to his office and the two of them sat down. Krystofiak said, "We conducted an investigation on the allegations regarding the comment that you made to your co- worker Rick Lemley. It sounds like based on our last discussion you had done some soul searching and realized that you should not me making comments such as that in the workplace. Based on our investigation and a 'preponderance of evidence,' we will be presenting you with a documented work history entry."

206. Xenia said, "Unfortunately, Andrea, because you had already received a written Negative Work History, this will put you on a Final Negative Work History."

207. Plaintiff said, "I should never have received a Negative Work History in the first place. The allegations that they presented to me when I returned to work are completely false. There are witnesses to prove that- and like this incident- it did not happen." Krystofiak said, "Unfortunately I wasn't in charge back then so I can't really do

32

1   something about that one.".

2   208.   Plaintiff said, "Well, my attorneys have repeatedly raised the issue with the

3

4   Harrah's attorneys."

5   209.   Krystofiak said, "Well, I will investigate it for you." He took note. "Today

6   we are here to discuss the incident that occurred on Sunday."

7   210.   Plaintiff said, "I should not have received that write up in March and I

8   should not be receiving this one now. This is yet another ploy to get me to leave."

9

10   211.   Krystofiak said, "That is not true."

11   212.   Plaintiff said, "Yes it is. This company has been on a witch hunt with me

12   ever since this incident occurred in July."

13   213.   Xenia chimed in and said, "Andrea this is how I would have reacted to any

14   employee. You are not being treated any differently. We had an employee come to us and

15   say that you made them uncomfortable and so we need to act."

16

17   214.   Plaintiff said, "Well, I am not comfortable with how Guy Hyder responded

18   to when I went to him for help. Is there a write up in his file? Does he have a Final

19   Negative in his file? I am not happy with how John Koster has conducted himself. Is there

20   a write up in his file?"

21   215.   They tried to bring Plaintiff back to the incident that occurred on Sunday.

22

23   216.   Plaintiff said, "It did not happen. You have both been directed to do this to

24   get me out of here."

25   217.   Krystofiak said, "Are you saying that I am doing this?"

26   218.   Plaintiff said, "Matt I don't know you. But I believe that you are on a witch

27

28   33

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

hunt to do everything you can to get me off this property."

219.   He wrote the words, "Witch hunt" on his notepad. He said, "We don't discuss your case here. No one knows about this conversation either. This is between Xenia and you and me. No one else."

220.   Plaintiff told Krystofiak that she had handled this with more class than anyone else. Plaintiff said that she always personally acknowledged John Koster and the others when she saw them. Plaintiff said that Koster shunned her each and every time.

221.   Krystofiak said that he would investigate. Plaintiff said, "Everytime he shuns me I write it down, the date, the time, the place, and who noticed."

222.   Krystofiak kept circling back to the discussion about Sunday and he said that based on a preponderance of evidence Plaintiff would be held accountable. Plaintiff looked at both of them and said, "He [Plaintiff's co-employee] did not say that he was uncomfortable. He did not ask me to stop."

223.   Krystofiak said, "Well, based on the witness (whom he could not identify) he did."

224.   Plaintiff asked them, "Who knows about this conversation? Who instructed you to have this conversation with me?" He said nothing. Plaintiff asked him again, "Who knows about this conversation?"

225.   Krystofiak stared at Plaintiff and said nothing. Xenia said, "I have not discussed this with anyone."

226.   Plaintiff asked Krystofiak again who instructed him to do this and/or whom he discussed it with and he said, "My counsel."

34

227.  Plaintiff said, "Your counsel? I thought you said that this was between you and Xenia and me."

228.  He said, "You are suing my boss and one of my employees, Andrea."

229.  Plaintiff said, "You lied. Give me the name of who you had this conversation with."

230.  He said, "Gerald Ensign (sp)." Plaintiff wrote his name down and asked Krystofiak to make her a copy.

231.  Krystofiak left the room to make a copy and Xenia said, "Andrea, are you okay?"

232.  Plaintiff looked at her and said tearfully, "There are not words to describe how I feel."

233.  She said, "I know. This is terrible."

234.  Plaintiff said, "Everything....everything I have worked for is gone. Those good ol' days with you and Gillian (former VP) and Don and I...they are gone. This company and that guy destroyed my life....destroyed my family's name".

235.  She said, "Andrea, everything is going to be okay."

236.  Plaintiff said, "Just please tell the truth. Please."

237.  Xenia said, "Andrea...there is nothing...no job that will cause me to compromise my own integrity." She said, "I will, Andrea."

238.  Krystofiak came back to the room and handed Plaintiff a copy of the work history. Plaintiff said, "Matt, if you are going to continue meeting with me like this, I ask that you please tell me the truth. Just tell the truth. Don't lie to me."

35

239.   Xenia said that Plaintiff could go home for the day if she wanted to. Plaintiff agreed and got up and left.

240.   At 8:45 a.m. the following day Plaintiff pulled out of her driveway on Centerville Lane in Gardnerville behind a black Chevy Avalanche. The truck was slightly raised off the ground with very large tires and shiny rims. It was John Koster. Plaintiff could see that he saw her in the rear view mirror. He immediately began to speed. Following the speed limit Plaintiff was behind him giving him two car lengths of room behind his vehicle. At the end of Centerville Lane at the stop sign he pulled onto Foothill Rd. The speed limit there is 50 miles per hour. He sped up to a speed of 75 miles per hour and passed 3 cars on a double solid line (no passing zone). The road is very narrow and dangerous to pass on. There was a Mercedes in front of Plaintiff. It was black with the plates "2ZEPHYR". The car swerved a bit as John Koster dangerously passed the cars.

241.   Plaintiff went into work and called Xenia Wunderlich, who was at home.

242.   Plaintiff asked if she could meet with her and she said that she was at home but could meet with Plaintiff later in the day. Plaintiff said, "I want to speak to you regarding my resignation." Xenia said, "Oh no." She said that she would get to work and call Plaintiff. A few minutes later she said that she would meet Plaintiff at ten thirty a.m..

243.   Plaintiff went to the office and John Koster and Dave Monroe were standing in front of Koster's administrative assistant's desk, Cindy Peak. Koster saw Plaintiff and immediately grabbed ahold of Monroe and said, "Randy...Randy." He was referring to Randy Conroy, the VP of Finance who was sitting in the office. Randy was at his desk. Koster grabbed Monroe by the arm and brought him in the office and they shut the door.

36

244.    Plaintiff walked into Xenia's office and she said that Matt Krystofiak was there. Krystofiak was sitting down at the desk and he looked very ashamed, very down. He was looking down at the ground. Plaintiff sat down and said, "I do not want to discuss this. I have been advised by my attorneys that they will be sending a written letter to Harrah's and its attorneys by Friday with my formal resignation." Xenia said, "Of course. I understand."

245.    They had Plaintiff sign a resignation letter stating that she was voluntarily resigning. Xenia pointed to the comments section and she said, "You don't have to fill anything out there." Plaintiff signed it and Xenia said that they would pay Plaintiff for the two weeks but that it was normal for them to let her go immediately because that it was customary for most hosts.

246.    Xenia said that Plaintiff would receive her check in the mail. She said that Plaintiff would be 86'd from all Harrah's properties for 1 year. She said that she would walk Plaintiff to her office to collect her belongings. Xenia got up to make Plaintiff a copy of the resignation form. While sitting there, Plaintiff stared at Krystofiak and he said, "How are you holding up?" Plaintiff said, "I'm fine, thank you."

247.    Xenia returned and asked if Plaintiff had any questions. Plaintiff said no.

248.    Xenia started walking Plaintiff to her office. They were alone in front of the elevator on the Convention Center level. Plaintiff was a little tearful and Xenia said, "Andrea, can I just say something?"

249.    Plaintiff said, "yes."

250.    Xenia said, "Can I just give you a hug?"

37

251.   Plaintiff said, "Ok."

252.   Xenia said, with tearful eyes, "I just want you to know that I pray for you and your family everyday. This is just awful what has happened to you. I want you to know that I am here for you. I know this is hard but I know you are going to be okay. You will do wonderful things in your life. I thought so highly of you way back when and my opinion of you has never changed. I'm very proud of you. All of this is awful."

253.   Plaintiff said, "I never wanted my career to end this way."

254.   Xenia said, "I am so glad that I got to be the person to walk you out of here. You walk out of here with your head held high. You be strong. I hope that when this is over you and I can be friends. I hope that I will get to spend time with you again and talk."

255.   Plaintiff thanked her and asked her to, "Please be strong. It is going to be a very difficult fight. I know I can do it. But please tell the truth."

256.   She said, "This job is not worth it. I will."

257.   When they went to Plaintiff's office cubicle Plaintiff started to pack while Xenia tried very hard to distract the others from what was going on. Plaintiff carefully packed her belongings in a box. She had a stack of cards that she had received from guests and employees throughout the last few months. Xenia looked at the cards and Plaintiff said, "Am I allowed to take these?" Xenia said that she had been instructed to not let Plaintiff take any notes from guests or employees. Plaintiff said, "They are addressed to me." Xenia said, "I'm sorry. I've been instructed to not let you take them." Plaintiff set them down and they were the only thing left behind that was personal.

258.   On the top of Plaintiff's desk Plaintiff had one picture. It was a picture of a

38

girl on a horse. Xenia said, "What a beautiful picture. Who is that?" Plaintiff said, "It's

Jaycee Dugard. I love it because she has been through such trauma but if you look closely

she still has a twinkle in her eye. I put it there so that when I had a hard time at work I just

look at her on that horse and it gives me strength." Xenia appeared very choked up.

Plaintiff took the picture down and put it in the box.

259.    Xenia asked Plaintiff if she wanted to say goodbye to anyone. Plaintiff said,

"What I would like is a graceful exit. No thank you." She agreed.

260.    When they headed toward Plaintiff's car Xenia said that she was proud. She

again encouraged Plaintiff to be strong and she said, "You walk out of here proud and with

your head held high, Andrea."

261.    She said, "I remember that I have had some tribulations in my life and they

made me a better person. They made me stronger."

262.    Plaintiff said, "If you think back to where I was in a hospital last year,

feeling helpless, I am stronger now."

263.    She said, "You have come such a long way. We have our Andrea back

again."

264.    Plaintiff said to Xenia, "No matter what the outcome of this, I will walk

away knowing that I stood my ground, that I did my very best, and that my life will go on."

265.    She said, "Yes you have. You are going to do wonderful things in this

world, Andrea. I know you will. You have so much experience You are smart. I know you

will be okay. Just continue to be strong."

266.    As they approached Plaintiff's truck Xenia gave Plaintiff a hug and  said, "I

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

39

want you to take care of yourself. Everything will be okay. I want you to be strong and I will be there for you."

267.   Plaintiff looked at her with tears and could see that she had tears in her eyes. Plaintiff said, "I want you to be strong too. This isn't going to be easy. But I need you to be strong too. You have a lot of people counting on you."

268.   She said, "I will. I promise."

269.   They said, "Goodbye."

## CLAIMS AGAINST DEFENDANTS

## FIRST CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

270.   Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as if set forth, herein, verbatim.

271.   Defendants, by and through the conduct of their managerial agents, engaged in conduct intended to cover up the sexual assault which had taken place on July 11, 2008.

272.   Defendants, by and through the conduct of their managerial agents, intended to and did inflict fear and humiliation on Plaintiff in order to silence her and to dissuade her from pursuing her legal rights.

273.   Defendants, by and through the conduct of their managerial agents, intended to and did inflict fear and humiliation on Plaintiff in order to punish and retaliate against her for having pursued her legal rights.

274.   Defendants' conduct was extreme and outrageous with the intent of causing

40

emotional distress to Plaintiff.

275.   Plaintiff suffered severe and extreme emotional distress as the actual and proximate result of Defendants' conduct.

276.   As a result, Plaintiff suffered damages thereby, for which she is entitled to recover.

277.   Defendants' acts were intentional and malicious, entitling Plaintiff to recovery of Punitive Damages.

## SECOND CLAIM FOR RELIEF

## INVASION OF PRIVACY

278.   Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as if set forth herein, verbatim.

279.   Plaintiff had an actual expectation of seclusion, solitude, and privacy which was objectively reasonable.

280.   Defendants, through the conduct of their agents, intentionally intruded upon the exclusion, solitude, and privacy of the Plaintiff.

281.   Defendants, through the conduct of their agents, by pretense and fraud and misrepresentation  gathered information regarding the private and personal life of Plaintiff and regarding her  medical condition or conditions.

282.   The intrusions were such that each one was and would be highly offensive to Plaintiff and would be highly offensive to a reasonable person.

283.   Defendants, through the conduct of their agents, entered Plaintiff's home

41

and gathered information, including, without limitation, information from Plaintiff's computer and other private information including medical information.

284.    Plaintiff alleges, on information and belief, that Defendants, through their agents, copied, deleted, alter, and destroyed, the private and personal information of Plaintiff on the computer and sought to and did inspect it to determine the state of mind of Plaintiff, the information possessed by Plaintiff and other information related to the sexual assault and the conduct of and involvement of others after the July 11, 2009 incident.

285.    Defendants publicly disclosed private facts of Plaintiff to which she had a right of privacy.

286.    These disclosures and each of them was and would be offensive and objectionable to a reasonable person of ordinary sensibilities.

287.    Defendants' conduct was extreme and outrageous with the intent of and reckless disregard for causing emotional distress to Plaintiff

288.    Plaintiff suffered severe and extreme emotional distress as the actual and proximate result of Defendants' conduct.

289.    As a result, Plaintiff suffered damages thereby, for which she is entitled to recover.

290.    Defendants' acts were intentional and malicious, entitling Plaintiff to recovery of Punitive Damages.

## THIRD CLAIM FOR RELIEF

### TRESPASS

42

291.   Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as if set forth herein, verbatim.

292.   Plaintiff had an actual expectation of seclusion, solitude, and privacy on and in her home which was objectively reasonable.

293.   Defendants, by and through their agents Hyder and Masters, intentionally intruded upon the seclusion, solitude, and privacy of the Plaintiff by entering into her home and on her land.

294.   Defendants and each of them trespassed upon and throughout her home and gathered information regarding her medical conditions, and regarding other private matters and information and/or aided, counseled and encouraged others, to trespass for their benefit.

295.   The intrusions and trespasses were such that each one was and would be highly offensive to a reasonable person.

296.   Defendants' conduct was extreme and outrageous and was with the intent of and reckless disregard for causing emotional distress to Plaintiff

297.   Plaintiff was caused to suffer and suffered severe and extreme emotional distress, as the actual and proximate result of Defendants' conduct.

298.   As a result, Plaintiff suffered damages thereby, for which she is entitled to recover.

299.   Defendants' acts were intentional and malicious, entitling Plaintiff to recovery of Punitive Damages.

43

## FOURTH CLAIM FOR RELIEF

### DEFAMATION AND TRADE DEFAMATION

300.   Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as if set forth herein, verbatim.

301.   Defendants, through their agents, made false and defamatory statements regarding the character of and credibility of Plaintiff in general and in particular regarding the assault, battery and false imprisonment of Plaintiff by Ben Roethlisberger.

302.   Defendants, through their agents, made false and defamatory statements regarding Plaintiff's illness.

303.   Defendants, through their agents, made false and defamatory statements regarding Plaintiff's relationships with various men.

304.   Defendants, through their agents, made false and defamatory statements regarding Plaintiff about her honesty, integrity and credibility and regarding her stability and/or suitability for employment.

305.   Defendants imputed criminal conduct to Plaintiff.

306.   Defendants imputed sexual promiscuity to Plaintiff.

307.   Defendants imputed a lack of fitness for her trade, business, and profession.

308.   Defendants imputed serious sexual misconduct to Plaintiff.

309.   Defendants made unprivileged publications and communications of the foregoing statements.

310.   Defendants knew or upon reasonable inquiry and investigation would have learned that their defamatory statements were false and were, at the very least, negligent in

44

1  making the statements and publications.

2      311.   Plaintiff sustained substantial actual and presumed damages to her person

3

4  and profession as the direct and indirect consequences and result of those acts and

5  statements, for which damages she is entitled to recover.

6      312.   Defendants' conduct was intentional and malicious, entitling Plaintiff to

7  recovery of Punitive Damages.

8

9

10                    ## FIFTH CLAIM FOR RELIEF

11        TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY

12      313.   Plaintiff incorporates by reference each and every allegation in the preceding

13  paragraphs as if set forth herein, verbatim.

14      314.   Defendants, through their agents, created a hostile work environment so

15  extreme that no reasonable employee would be expected to remain in his or her position of

16

17  employment.

18      315.   Defendants, through their agents, created a hostile work environment so

19  extreme that Plaintiff could not remain in her employment.

20      316.   Defendants' conduct, in creating a hostile work environment in which

21  Plaintiff could not be expected to remain, engaged in the constructive discharge of

22

23  Plaintiff from her employment.

24      317.   Defendants' conduct, in creating a hostile work environment in which

25  Plaintiff could not be expected to remain and in thereby constructively discharging

26  Plaintiff, acted with the intent to punish and retaliate against Plaintiff for having exercised

27

28                              45

537 RALSTON STREET
POST OFFICE BOX 3689
RENO, NEVADA 89505
TELEPHONE (775) 323-7790 • FAX (775) 323-5454

her legal rights to seek redress for the sexual assault which occurred on July 8, 2008 and for the ensuing cover up engaged in by Defendants.

318.   The right of citizens to seek legal redress for wrongs committed against them is protected by strong and compelling public policy in the State of Nevada.

319.   The right of citizens to be free from sexual assault is equally protected by strong and compelling public policy in the State of Nevada.

320.   The right of citizens to complain of a sexual assault is equally protected by strong and compelling public policy in the State of Nevada.

321.   The right of citizens to be free from retaliation for having complained of sexual assault is equally protected by strong and compelling public policy in the State of Nevada.

322.   The right of citizens to be free from retaliation for complaining of a cover up of a sexual assault is equally protected by strong and compelling public policy in the State of Nevada.

323.   Defendants' conduct in constructively discharging Plaintiff from her employment was in violation of each of the aforesaid strong and compelling public policies of the State of Nevada..

324.   As a proximate result of Defendants' conduct, Plaintiff has suffered damages including but not limited to loss of income, extreme emotional distress, and damage to her personal and professional reputation, for which she is entitled to recover against Defendants.

46

325.   Defendants' conduct was intentional and malicious, entitling Plaintiff to recovery of Punitive Damages.

WHEREFORE, Plaintiff prays for relief as follows:

1.   For damages in an amount in excess of $10,000;

2.   For special and consequential damages in an amount to be proven at trial;

3.   For prejudgment and post-judgment interest on all sums awarded, according to proof at the maximum legal rate;

4.   For punitive and exemplary damages to Plaintiff in an amount in excess of $10,000;

5.   For costs of suit, interest, and reasonable attorney's fees; and,

6.   For such other relief as the Court deems just and proper.


**AFFIRMATION**

The undersigned Counsel does hereby affirm that the foregoing document does not contain the social security number of any person.

DATED this 8th day of July, 2010.

DUNLAP & LAXALT

*Monique Laxalt*

Calvin R.X. Dunlap, Esq.
Monique Laxalt, Esq.
Attorneys for Plaintiff.

47